**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Boston Post Partners II LLP,<br><br>    Plaintiff,<br><br>v.<br><br>Michael Paskett, Todd Hines, FTW LLC, Cascade Land Holdings LLC, and Venture Group Unlimited LLC,<br><br>    Defendants. | No. CV-16-02401-PHX-DLR<br><br>**ORDER** |

This case arises out of the sale of farmland located in Maricopa County, Arizona ("Property") and the convoluted efforts to raise capital for that purchase. At issue is Defendants' Motion for Summary Judgment, which is fully briefed. (Docs. 123, 131, 138.) For the following reasons, the motion is granted in part and denied in part.[1]

**I. The Parties**

Plaintiff is Boston Post Partners II LLP ("BPP"). Herberden Ryan is the principal of BPP, and Timothy Kulka is a partner. Neither is a party to this action.

Former Defendants Nopal Cactus Farms LLC ("Nopal") and Golden Sands Partnership ("Golden Sands") owned the Property during the relevant time period. Former Defendant Charles Newman is the principal of Nopal and Golden Sands. The

---

[1] Defendants' request for oral argument is denied. *See* Fed. R. Civ. P. 78(b); LRCiv. 7.2(f).

Court will refer to these parties collectively as "Sellers" for purposes of this order. BPP and Sellers settled the claims between them on August 16, 2017. (Doc. 146.)

Defendant Michael Paskett is the principal of Defendant Venture Group Unlimited LLC ("Venture Group").

Defendant Todd Hines is the principal of Defendant Cascade Land Holdings, LLC ("Cascade").

Venture Group and non-parties Douglas Larsen, Northwest Gypsum LLC ("Northwest"), and Venture Capital Group, Inc. ("Venture Capital") are members of non-party GSJV, LLC, an Arizona limited liability company. Non-party John Boley is GSJV's statutory agent.

Cascade, Venture Group, and non-party Stahl Hutterian Brethren ("SHB") are each members of Defendant FTW, LLC, an Arizona limited liability company. Non-party John Stahl is the president of SHB.

## II. Factual Background[2]

Paskett, Hines, Ryan, and Kulka had a working relationship throughout 2014. During that time, Paskett worked as a consultant for one of Hines' companies, and he and Hines worked with Ryan and Kulka on a separate transaction. Paskett also talked to Ryan and Kulka about plans to purchase the Property. Though Paskett stopped working for Hines in January 2015, he cannot recall whether he informed Ryan and Kulka of this separation.

On February 13, 2015, Paskett organized GSJV. That same day, GSJV entered into an agreement with Sellers to purchase the Property for over $10 million ("GSJV Contract"). GSJV was required to make an initial deposit of $500,000 toward the purchase price. Of that, Paskett paid $150,000 in the form of a credit from Sellers, another party paid $50,000, and Hines—though not identified as a member of GSJV—

---

[2] The following facts are drawn from the parties separate statements of facts and the record items cited therein. (Docs. 124, 133.) For purposes of this order, the facts are presented and all reasonable inferences are drawn in the light most favorable to BPP, the non-moving party.

paid $300,000. The GSJV Contract had a closing deadline of March 31, 2015.

During the following week, Paskett and Hines communicated with Ryan and Kulka via text message about BPP's involvement in the purchase of the Property and a potential equity sharing arrangement. These negotiations culminated and were memorialized in a February 24, 2015 agreement under which, in exchange for an equal share in the equity compensation received from the Property, BPP agreed to identify and source third-party capital, on an exclusive basis, to fund the purchase and development of the Property ("Letter Agreement"). The Letter Agreement was to expire 75 days after execution (May 10, 2015), unless the parties agreed in writing to extend the term or the closing date of the GSJV Contract was extended.

Thereafter, BPP worked to raise capital to fund the purchase. BPP solicited investors to raise between $25 and $28 million, and several investors were willing to proceed if given sufficient time for due diligence. On March 10, 2015, BPP asked Sellers for a 90-day due diligence extension for potential third-party capital investors, but this request was not granted. On April 1, 2015, Sellers cancelled the GSJV Contract for lack of funding.

All parties nonetheless continued negotiations after the cancellation of the GSJV Contract. On April 7, 2015, BPP, Paskett, and Sellers met to again discuss a possible 90-day due diligence extension. BPP offered Sellers a 5% equity interest in the Property in exchange for an extension. The parties failed, however, to reach an agreement at the meeting. On April 13, 2015, BPP sent Sellers an email renewing its request for a 90-day extension. BPP also sent the email to Paskett. Although no agreement was reached, Paskett responded approvingly to BPP's proposal. Paskett also alluded to a possible alternative purchasing arrangement involving Stahl. Paskett assured BPP that he would close the transaction and that the parties could then "run down the road together without worry." Paskett continued to make similar representations to BPP in the following weeks.

On April 13, 2015, however, Paskett organized FTW, which then contracted with

- 3 -

Sellers on April 20, 2015 to purchase the Property ("FTW Contract"). The FTW Contract had the same sale price as the GSJV Contract, but required a $1.5 million payment at closing. Of this, Stahl paid $1 million and GSJV's deposit was credited toward the remaining $500,000.

Paskett represented to BPP that SHB was making a bridge loan through FTW, and that it could be bought out for recovery of its investment plus a reasonable return. Unbeknownst to BPP, however, Paskett's discussions with Stahl contemplated that he would be a long-term investor in the Property. When the FTW Contract closed on May 1, 2015, none of the governing documents included a provision for BPP to purchase SHB's interest or otherwise invest in the Property.

In November 2015, BPP initiated this action in the District of Massachusetts. The initial complaint and first amended complaints allege claims against Paskett, Hines, Newman, Nopal, and Golden Sands, only. In addition to damages, BPP demanded that a constructive trust be created "over the assets of BPP held by Defendants." (Doc. 1 at 20; Doc. 7 at 20; Doc. 79 at 19.) To that end, in January 2016 BPP recorded Notice of Lis Pendens against the Property, which at the time was owned by FTW, with the Maricopa County Recorder.

In April 2016, the Massachusetts court transferred the case to this Court. Several months later, Nopal and Golden Sands noticed a Trustee's Sale of the Property on the basis that BPP's recordation of the lis pendens breached the deed of trust encumbering the Property. FTW obtained a preliminary injunction enjoining the trustee's sale from the Maricopa County Superior Court, and that state court action remains ongoing. After FTW became involved in the state court litigation, BPP amended its complaint in this action to name FTW, Cascade, and Venture Group as defendants.

BPP's second amended complaint alleges that Paskett and Hines breached the Letter Agreement and the implied covenant of good faith and fair dealing inherent therein. It also alleges that, through the Letter Agreement and the surrounding negotiations, BPP and Defendants formed a joint venture to invest in Arizona farmland,

and that all Defendants breached the fiduciary duties flowing from that joint venture. Finally, BPP claims that Paskett defrauded it, that Paskett and Hines were unjustly enriched by BPP's labor, and that all Defendants conspired to deprive BPP of its equity share of the Property.

In December 2016, FTW answered the second amended complaint and asserted a counterclaim against BPP, seeking a declaratory judgment that the lis pendens is invalid and statutory damages under A.R.S. § 33-420. Defendants now move for summary judgment on all claims against them and on FTW's counterclaims.

## III. Legal Standard

Summary judgment is appropriate when there is no genuine dispute as to any material fact and, viewing those facts in a light most favorable to the nonmoving party, the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Facts are material if they might affect the outcome of the case under governing law, and a dispute over those facts is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment may also be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## IV. Discussion[3]

### A. Breach of Contract (Against Paskett and Hines)

Paskett and Hines contend that they cannot be liable for breach of contract because they are not parties to the Letter Agreement and, even if they are, BPP materially breached the Letter Agreement by failing to source third-party capital within the Letter

---

[3] Defendants devote several pages of their motion to arguing that Arizona law, rather than Massachusetts law, should apply to Plaintiff's claims. (Doc. 123 at 5-7.) Plaintiff responds that "no substantive conflicts exist between the laws of Arizona and Massachusetts on the legal issues presented by" the motion and, therefore, "a choice of law analysis is unnecessary." (Doc. 131 at 8.) Plaintiff also relies on Arizona authorities throughout its response memorandum. Accordingly, the Court will rely on Arizona law for purposes of this order.

- 5 -

Agreement's term, thereby relieving them of any further obligation to perform. After careful consideration, the Court concludes that none of these arguments mandate summary judgment.

### 1. Parties to the Letter Agreement

First, the Court cannot say as a matter of law that Paskett and Hines were not parties to the Letter Agreement because there is substantial ambiguity in the record regarding the actual or intended parties to the transaction. Defendants contend that the Letter agreement was between BPP and non-party GSJV. BPP argues, however, that the Letter Agreement was between it, Paskett, Hines, Larsen, and Boley. BPP's position is colorable, especially when viewing the facts and drawing all reasonable inferences in its favor.

The Letter Agreement identifies the contracting parties as "Herberden W. Ryan, Timothy Kulka and their affiliates ('BPP') and Michael Paskett, John Boley, [and] Doug Larsen ('GSJV,' each a 'Party' and together, the 'Parties')." (Doc. 52-1 at 32.) It therefore appears to define "GSJV" as "Michael Paskett, John Boley, [and] Doug Larsen," rather than as the GSJV entity that contracted with Sellers. Indeed, neither Paskett nor Boley are members of GSJV. Boley is identified as GSJV's statutory agent, but not as a member, and although Paskett is the principal of Venture Group, he is not, individually, a member of GSJV. (Doc. 124-1 at 4-5.) Moreover, the Letter Agreement omits GSJV members Venture Group, Northwest, and Venture Capital from the definition of "GSJV." Given these ambiguities, a jury reasonably could conclude that "GSJV" was used in the Letter Agreement as shorthand or a term-of-art to refer to Paskett, Boley, and Larsen, individually, and that when Paskett signed the agreement as "GSJV representative" he was signing on behalf of himself, Boley, and Larsen.

Further, BPP cites evidence that Hines was an active participant in the transaction, but that his name deliberately was omitted from the relevant contracts because he was going through a divorce at the time and did not want to complicate those proceedings. This evidence, coupled with evidence that Paskett had previously dealt with BPP in his

capacity as a consultant for Hines' company, would permit a jury to reasonably find that Paskett acted in an agency capacity on behalf of Hines when he negotiated with Sellers to purchase the Property and with BPP to obtain capital to fund the purchase.

### 2. Breach of BPP's Obligations Under the Letter Agreement

The Court also is not persuaded that BPP materially or anticipatorily breached the Letter Agreement such that Paskett and Hines were excused from further performance. Preliminarily, the Court rejects BPP's argument that it was required only to make best efforts to source third-party capital, but not to actually obtain it. The Letter Agreement unambiguously states that "BPP will identify and source third party capital." (Doc. 52-1.) Moreover, the Letter Agreement uses the phrase "make best efforts" to describe other obligations, but not BPP's obligation to source third-party capital. Finally, BPP's interpretation of the Letter Agreement would lead to an absurd result: namely, that it would be entitled to an equal equity share in the transaction despite failing to fund the purchase of the Property.[4]

It is undisputed that BPP failed to obtain third-party capital within the Letter Agreement's 75-day term. Nonetheless, the Court is not convinced that BPP's failure defeats its breach of contract claim because the evidence would permit a jury to reasonably find that Paskett and Hines breached other obligations prior to BPP's breach. For example, the Letter Agreement clearly states that "[i]n all cases, BPP will serve as the exclusive provider of third party financing." (Doc. 52-1 at 32.) But prior to the Letter Agreement's termination date—meaning prior to BPP's deadline to perform—Paskett and Hines explored alternative purchasing arrangements with Stahl and SHB. If BPP was to serve as the exclusive provider of third party capital until May 10, 2015, it is unclear why Paskett and Hines were seeking alternative funding sources as early as April of that year.

Indeed, these facts highlight a strange feature of the Letter Agreement. The Letter

---

[4] For this reason, the Court need not address Defendants' alternative argument that the Letter Agreement would be unenforceable for lack of consideration if BPP was not required to obtain third-party capital.

- 7 -

Agreement was to expire on May 10, 2015, unless the parties agreed in writing to extend the term or the closing date of the GSJV Contract was extended. The Letter Agreement was silent, however, on what would happen if, as occurred here, the closing date was not extended and the transaction did not close. It therefore is unclear whether BPP was to continue sourcing third-party capital after March 31, 2015 and until May 10, 2015, even though the underlying purchase contract for which those funds were to be raised had been cancelled. There is evidence, however, that BPP, Paskett, Hines, and Sellers continued negotiating even after the GSJV Contract had been cancelled, and that Paskett contemplated BPP's continued involvement in the transaction. A jury therefore could reasonably conclude that, despite the cancellation of the GSJV Contract, BPP, Paskett, and Hines contracted to continue their joint efforts to purchase the Property until May 10, 2015, and that during that time BPP was to serve as the exclusive source of third-party capital. For these reasons, the Court denies summary judgment on BPP's breach of contract claims.

### B. Breach of Good Faith and Fair Dealing (Against Paskett and Hines)

Defendants fail to mention, let alone analyze, BPP's claim for breach of the implied covenant of good faith and fair dealing, presumably because they believe its fate is tied to the underlying breach of contract claim. Because the Court declines to grant summary judgment on the breach of contract claim, it likewise declines to grant summary judgment on BPP's claim for breach of the implied covenant of good faith and fair dealing.

### C. Breach of Fiduciary Duty (Against All Defendants)

BPP claims the Letter Agreement formed a joint venture or partnership between it and Defendants to purchase and develop the Property, and that under Arizona law partners owe each other fiduciary duties to place the interests of the partnership above their own. *See* A.R.S. § 29-1035. Defendants contend, however, that the Letter Agreement was merely a service contract, and that no fiduciary duties flowed from it because no partnership was created.

A jury reasonably could find that the Letter Agreement was intended to create a partnership. The Letter Agreement discusses matters beyond mere services. For example, the Letter Agreement states that the parties would each become shareholders in another corporation, which would be used as an "Acquisition Vehicle" to acquire by merger the assets of the Property. (Doc. 52-1 at 32.) The parties were then to share equally in the equity compensation received from the Property. (*Id.*) Further, communications between Paskett, Hines, and BPP, both before and after execution of the Letter Agreement, suggest that the parties contemplated BPP's long-term involvement in the development of the Property. Accordingly, the Court denies summary judgment on BPP's breach of fiduciary duty claims as they pertain to Paskett and Hines because a jury reasonably could find that both were parties to the Letter Agreement, that the Letter Agreement created a partnership or joint venture, and that Paskett and Hines placed their own interests above the interests of the partnership as a whole. The Court grants summary judgment in favor of Cascade, Venture Group, and FTW, however, because none of these entities are parties to the Letter Agreement.[5]

### D. Unjust Enrichment (Against Paskett and Hines)

Unjust enrichment is an equitable claim available only when the plaintiff lacks an adequate remedy at law. *See Freeman v. Sorchych*, 245 P.3d 927, 936 (Ariz. Ct. App. 2011). "To recover under a theory of unjust enrichment, a plaintiff must demonstrate five elements: (1) an enrichment, (2) an impoverishment, (3) a connection between the enrichment and impoverishment, (4) the absence of justification for the enrichment and impoverishment, and (5) the absence of a remedy provided by law." *Id.*

Paskett and Hines argue that they received no benefit and, even if they did, they were justified in receiving it. BPP cites evidence, however, that it provided work product concerning capital investment and development plans to Paskett and Hines, that it devoted a substantial amount of time and resources to the GSJV Contract, and that

---

[5] Indeed, BPP does not argue otherwise. BPP contends that the Letter Agreement was between it, Paskett, Hines, Larsen, and Boley. (Doc. 133 ¶ 29.)

- 9 -

ordinarily it would earn over $1 million for comparable work. A jury reasonably could find that Paskett and Hines received a benefit from BPP, and that "in good conscience [they] should provide compensation." *Id.*

### E. Fraud (Against Paskett)

To prevail on a fraud claim, a plaintiff must prove the concurrence of the following elements:

> (1) a representation, (2) its falsity, (3) its materiality, (4) the speaker's knowledge of its falsity or ignorance of its truth, (5) the speaker's intent that the information should be acted upon by the hearer and in a manner reasonably contemplated, (6) the hearer's ignorance of the information's falsity, (7) the hearer's reliance on its truth, (8) the hearer's right to rely thereon, and (9) the hearer's consequent and proximate injury.

*Green v. Lisa Frank, Inc.*, 211 P.3d 16, 34 (Ariz. Ct. App. 2009). Here, Paskett argues that he made no false statements. BPP cites evidence, however, that Paskett misled it to believe either than the GSJV Contract had been extended or that negotiations to essentially reach a new purchase agreement that would include BPP's involvement were ongoing. BPP contends that these representations were false because the GSJV Contract was, in fact, cancelled, and because Paskett knew that SHB would remain a long-term partner in the FTW Contract and that BPP would not have an opportunity to buy out SHB's interest or otherwise invest. A jury reasonably could conclude that Paskett made false statements.

Paskett also argues that BPP's reliance on these statements was not reasonable because BPP had already breached the Letter Agreement and because it knew the GSJV Contract had expired. As previously noted, however, whether BPP knew the GSJV Contract had expired or was misled to believe that it had been extended or was being renegotiated is genuinely disputed. Further, Paskett's alleged misrepresentations all occurred prior to May 10, 2015, BPP's deadline for performing. A jury reasonably could find that BPP was not in breach of the Letter Agreement at the time Paskett made the relevant representations. For these reasons, summary judgement on BPP's fraud claim is

denied.

### F. Civil Conspiracy (Against All Defendants)

Defendants argue that BPP's civil conspiracy claim fails for want of an underlying tort. Because the Court denies summary judgment on BPP's tort claims, it likewise denies summary judgment on BPP's civil conspiracy claim.

### G. Validity of Lis Pendens (Counterclaim Against BPP)

In its counterclaim, FTW asks the Court to declare BPP's lis pendens to be invalid and seeks an award damages under A.R.S. § 33-420. "Arizona courts have held repeatedly that if a lis pendens is filed with respect to an action that does not affect title to real property, the lis pendens is a groundless document[.]" *Hatch Co. Contracting, Inc., v. Ariz. Bank*, 826 P.2d 1179, 1183 (Ariz. Ct. App. 1991). Notwithstanding a plaintiff's characterization of his claims, "[a] general claim for money damages will not give rise to a constructive trust." *Burch & Cracchiolo, P.A. v. Pugliani*, 697 P.2d 674, 679 (Ariz. 1985).

Though BPP's prayer for relief requests a constructive trust over property owned by Defendants, at the time it recorded its lis pendens its complaint stated no claims against FTW, the owner of the Property. Even now, BPP asserts no claim against FTW that would affect its title to the Property. BPP argues that its lis pendens is valid because "[i]n Arizona 'courts will impose constructive trusts if there has been a breach of fiduciary duty.'" (Doc. 131 at 16 (quoting *Turley v. Ethington*, 146 P.3d 1282, 1285 (Ariz. Ct. App. 2006).) The Court, however, has already concluded that FTW owed BPP no fiduciary duty. BPP argues that FTW's fiduciary duties flow from the partnership created by the Letter Agreement, but FTW did not exist at the time the Letter Agreement was executed. Nor does BPP claim that FTW was a party to it. (Doc. 133 ¶ 29.) For these reasons, the Court grants summary judgment on Count II of FTW's counterclaim, which seeks a declaration that the lis pendens is invalid under A.R.S. § 33-420(B).

It is unclear, however, if FTW also seeks summary judgment on Count I of its counterclaim, which seeks damages from BPP for recording the lis pendens. Under

A.R.S. § 33-420(A):

> A person purporting to claim an interest in, or a lien or encumbrance against, real property, who causes a document asserting such claim to be recorded in the office of the county recorder, knowing or having reason to know that the document is forged, groundless, contains a material misstatement or false claim or is otherwise invalid is liable to the owner or beneficial title holder of the real property for the sum of not less than five thousand dollars, or for treble the actual damages caused by the recording, whichever is greater, and reasonable attorney fees and costs of the action.

To the extent FTW seeks summary judgment on this claim, it is denied for three reasons. First, FTW fails to discuss it in its motion. Second, though the Court concludes that the lis pendens is groundless, given the complexity of the underlying transaction a jury reasonably could conclude that BPP did not know the lis pendens was groundless at the time it was recorded. Third, FTW does not clearly elect statutory damages, and offers no evidence of actual damages. For these reasons,

**IT IS ORDERED** that Defendants' Motion for Summary Judgment (Doc. 123) is **GRANTED IN PART AND DENIED IN PART** as follows:

1. Summary judgment on Count I of the second amended complaint (breach of fiduciary duties) is granted in favor of Venture Group, Cascade, and FTW, and denied with respect to Paskett and Hines.

2. Summary judgment on Counts II-VIII of the second amended complaint (breach of contract and the covenant of good faith and fair dealing, civil conspiracy, unjust enrichment, and fraud) is denied.

3. Summary judgment on Count I of FTW's counterclaim (A.R.S. § 33-420(A)) is denied.

//
//
//
//
//

4. Summary judgment on Count II of FTW's counterclaim (A.R.S. § 33-420(B)) is granted in favor of FTW.

Dated this 28th day of August, 2017.

Douglas L. Rayes
United States District Judge